Okay, the next argued case is number 18-12-17, MiiCs & Partners America against Toshiba Corporation. May I please report, counsel? At issue below were claim construction involving two patents and interpretation of two contracts and an issue regarding damages. With respect to the 589 patent summary judgment, the district court further limited the term operative semiconductor in the 589 patent to only the material located within the boundaries of the TFT. This error is based on both improper location limitations and functional limitations. Operative semiconductor is not limited to the function performed by the material. Just like other claimed layers, operative semiconductor refers to the characteristic capabilities of the material formed in the recited step of the claimed method. For example, the material... You agree that operative has to be given some meaning, right? Oh, absolutely. It has to. So what's your conception of operative semiconductor other than something that helps operate the TFT? It is a material which is capable of operating in a TFT to control the flow of electrons between the source and drain electrodes. So it has to have that capability. So it has to be part of the semiconductor that's between the source and drain electrodes? No. Well, that's what the district court limited it to. But remember, this was a method claim. So operative semiconductor is a layer that's put down over the entire area where the array is going to be. Like gate insulating film is gate insulating film. It's put across the entire layer, but it only insulates actually where the gate electrode is. And operative semiconductor is not limited to what's in the TFT because we look at column three of the patent. It talks about forming operative semiconductor at the overlap of the bus lines. That's not where a TFT is. And even though it has the capability, continues to have the capability, there is no switching that takes place. It doesn't operate. And the claim term is not operating, it's operative, i.e. capable of being operated. The court's locational restriction of operative semiconductor is, as I noted, bound as being with inside the TFT, the boundary of the TFT, is contradicted by the specifications expressed in disclosure. If the court were to look at the yellow box on page 13 of our brief, which is a representation of Fig. 4, the yellow box is where the district court limited operative semiconductor. The specifications and drawings describe and show at least two locations where operative semiconductors formed, both of which are outside the yellow boundaries of that box. The red box is shown, which is actually referred to in column five as six, is expressly referred to in the specification as operative semiconductor. And the appellees at their brief... There's a question whether, you know, these figures are tightly drawn to scale. Typically, in patent law, we say that figures aren't necessarily presumed to be drawn to scale. That's correct, Your Honor, but this isn't a question of saying that 10% of the operative semiconductor is outside. We're not looking for some type of quantitative analysis. This is really qualitative. And again, the specification indicates that operative semiconductor can be at places outside of the boundaries of the TFT, i.e. at the overlap of the bus lines. Claim nine talks... But what is it in the specification that tells us that the TFT can't be over the intersection of the bus lines? There's absolutely no teaching whatsoever in the patent that the TFT is to be moved over the intersection of the bus... But there isn't anything in the specification, likewise, that says something to the contrary. Well, that's true, Your Honor, but there's absolutely no teaching. And the thing is, is that if we actually read through the claim limitations, we read through the steps of the claim, the overlap doesn't take place until later in the claim. The operative semiconductor layer is put down, and then in different positions, additional steps are taken to build up the TFT. The overlap between the source bus line and the drain bus line, which is referenced in figure four, that doesn't take place. There is no overlap. The operative semiconductor has been put down before that overlap takes place. So this notion that somehow that there's some teaching or suggestion in the patent, there is none. And to do with the district court judge, which was to limit the operative semiconductor to only the material within the TFT, would actually read out every disclosed embodiment, which could never be the proper claim. Well, not never, but only under very unusual circumstances could that be the right claim construction. And in fact, when the district court limited operative semiconductor to only the material inside the four lines of the TFT, it then had to rewrite claim four. Because claim four says form operative semiconductor, which was a claim element in claim one, as was TFT. It says form claim operative semiconductor at the overlap, which is utterly consistent with the teaching of the specification and supported by the spec at column three. But in order to reconcile this claim construction, the district court then had to take the term operative semiconductor, the limitation, out of that claim and substitute the thin film transistor, the TFT, where it said the operative semiconductor was limited. And just to give you one other reference, during the related 589 appeal, IPR, the appellants indicated that operative semiconductor was a material being made of amorphous silicon and endomorphous silicon. There was absolutely no recitation, no limitation whatsoever that it had to be only in the TFT and had to function as a switch. Because as I said earlier, the specification discloses areas where it wouldn't function as a switch. With respect to the 190 patent, the district court construed channel and anomic contact layer and a semiconductor layer to have its plain and ordinary meaning. Using the plain and ordinary meaning, appellants established infringement of all accused devices. These accused devices have the identical prior art structures shown in figure 15 and are specifically identified by the examiner as a channel and anomic contact layer and a semiconductor layer. And as explained in pages 19 and 20 of the Gray Brief, at summary judgment, the court restricted the plain and ordinary meaning of in to require physical inclusion within the material of both the semiconductor layer and the anomic contact layer. The court's restricted interpretation is contradicted by the plain meaning of the terms, the specification, the prosecution history, and the understanding of those. Do you think it's contradicted by the plain meaning? Yes, Your Honor. I guess I came in here thinking everything except the plain meaning favored you, maybe even to such an extent that it's worth overriding the plain meaning. The plain meaning? Well, yeah, the plain meaning. In, X, and Y, and yet in, you think, has to mean two different things. Well, first of all, it is a preposition, right? And it has to be, whenever we look at the word in, the plain meaning, it includes inclusion, position, and location. We don't just parse the meaning of the word in. If I was to say cream and coffee in a cup, Your Honor would know that the cream is in the coffee in one way and in the cup in another way. When used locationally, the specific nature of the physical relationship is always dependent on context. And so if we go to the specification, the specification makes clear that this claim phrase means that the channels within the limits of the omic contact layer from the inner left edge to the inner right edge at column 2's line 8 through 13. And it also recites virtually the same thing at column 6 lines 4 through 10. And one of the things that… I'm sorry. Can you just give me your final answer on what your translation is of a channel in an omic contact layer and a semiconductor layer? Because when I've read through the papers, I have seen some variance in how you've articulated it. So what's the final answer? Without a lifeline. The answer is, Judge, it's a channel included within the limits of the semiconductor layer and is located within the limits of the omic contact layer. That's the final answer. Okay, because I thought now it sounds like you're using the word in the same way for both the omic contact layer and the semiconductor layer. Whereas I thought part of your argument has always been that the word in in the claim limitation means something different with respect to the omic contact layer and vis-a-vis the semiconductor layer. It does for this caveat, Your Honor. What it doesn't mean is it doesn't mean in both instances physically included within material up. All of this kind of machinations come about as a result of the fact… But I thought you agreed that's true, that it means that with respect to the semiconductor layer. It means that with respect to the semiconductor because the position of the channel is defined as within the limits of the upper and lower end of the semiconductor. So what happens to be when we're talking about in the semiconductor, it's still positional. Although that position happens to be within the material of the semiconductor. It's also positional and locational because it has to do with where it is vis-a-vis the omic contact layer. And if Your Honor could turn the page… Can I just explain something to you that I was thinking last night? When in my house, my family room is directly above my garage. My garage is in the basement. Family room is on the first floor. Correct. So when I'm sitting in my family room watching TV, I couldn't possibly… No one would say I'm in my family room and I'm in my garage at the same time. Nobody would say that. That's true because remember this is a locational preposition. But if I were to say, Your Honor, you are in the reflecting pool in DC. I know that you're immersed within the water of the pool, but you're in the town of DC. So it's always kind of contextual. And I think the best way to look at this, Your Honor, is if during the prosecution history, the way this came up was that the claim was originally written that it was a channel in a semiconductor layer. All right? And during the prosecution, the examiner said, well, there's this moral reference that discloses a channel in a semiconductor layer. Because that's recognized to be a layer of the semiconductor layer between the source and drain electrodes. And if you look at the figures on page 24, and if you look at where the channel is in MoIRA, it extends beyond the inner limits of the ohmic contact layer. And so to distinguish over MoIRA, to show that we have the construction, we have the configuration of figure 15, we added in an ohmic contact layer. Which means, and we added it in accordance to the way it's specifically described at column two of the patent, where it says this amorphous silicon layer, which is the... I thought the primary reference had always been the admitted prior art. Well, that was one of it. But then the examiner comes up with this MoIRA reference. Remember, Judge, the invention here has to do with what the channel looks like at the end. It's kind of got a dog bone at the end. What we're talking about is if you took a cross section of the channel in the middle, that's a prior art structure. That's the way channels have looked at from the beginning. And so in an effort to try it, we argued that MoIRA doesn't teach the dog bone, but in an effort to try and distinguish it and get rid of it in other ways, we said, look, MoIRA doesn't have a channel in an ohmic contact layer because its channel extends beyond the inner limits of the ohmic contact layer, which contradicts column two and column six of the patent. And if you look at the figure, you can see that the channel, it does have a channel, but it extends beyond the inner limits. This is MoIRA figure 9C? Yes, Your Honor. Which is not actually in the joint appendix, except it's in your expert. It was in our expert, yes, Your Honor. But you didn't even give us MoIRA to look at. If it is, Your Honor, I couldn't point to you. I don't remember seeing it and studying it for the hearing, so the odds are no. But the only dispute was whether or not MoIRA taught a channel in an ohmic contact layer. And, in fact, if you look at page 9183, and you look at our specific comments to distinguish MoIRA, about halfway down the first part, turning to the rear ejection, it says claims 1, 17, and 18 specify that each of the TFTs have a channel in an ohmic contact layer and a semiconductor layer. And if we go all the way down to the bottom part of that paragraph, the next part about having a channel length larger, that has to do with the dog bone structure that we're not talking about here. It says MoIRA does not teach a channel formed in an ohmic contact layer and a semiconductor layer, as we pointed to figure 2. And the exact... I'm sorry, figure 2 of what? Figure 2 of our patent. Your patent. Okay. So that word formed in suggests something rather closer to what I think Judge Andrews thought than what you're suggesting of merely being within the boundaries of, if you're looking at it from top down. Well, Judge, it's not that I'm suggesting... Formed in sounds like made of the material of. Well, that's one suggestion, but there's no clear disavowal that requires it to be made of the material. And in fact, both experts, and this is in our brief, all the experts agreed that the material can't be both... The channel can't be both in the semiconductor layer and in the ohmic contact layer. And by in here, you mean... Physically located... Made of the material. Correct. Because remember, the ohmic contact layer, if you look at that picture, is actually a conductor. It's because those are the two electrodes. And so if the ohmic contact layer is... If there's a channel in the ohmic contact layer, the switch is never going to turn off. It's always going to be on. It doesn't work. It has to... When they make this process, they have to eat through the ohmic contact layer down to just at the channel layer. And so when they talk about in the ohmic contact layer, all the experts agree that there can't be any... There can't be any channel. There can't be any flow of electrons between two parts of the ohmic contact layer because it wouldn't work. And again, this thing about formed, if you look at column two, which is what the examiner looked at in response to our amendment, the examiner on 9189 comes back... I'm sorry. Column two of your patent? Of our patent. It says column two, lines eight through 13. It says the amorphous silicon layer 224 in the thin film transistor 230 includes a channel region 234, which overlies the gate electrode 222 and extends from the inner edge of the ohmic contact 233A and underlying the drain electrode to the inner edge of the ohmic contact 233B underlying the source electrode. And when the examiner... When we added in an ohmic contact layer, the examiner came back on 9189 and said, well, all you've done is described the configuration shown in figure 15 and he used the exact same numbers, element references from column two. So the examiner knew that in an ohmic contact layer is a positional. I mean, in is given as broad meaning. The PTAP wasn't convinced of this, right? The PTAP denied a request for an IPR on this patent because it concluded it couldn't make heads or tails of what these claim terms mean. So rather than institute and decide the prior art patentability question, it didn't... It chose... It refused to speculate in its view what the meaning of the claim was and then denied institution. But there was no dispute about this aspect of the claim. There was no claim construction dispute for the IPR about this aspect of the claim, this structure. There was a dispute. There was at A118283 where they quoted this very claim limitation. They saw what you were proposing and what the petitioner was proposing and said, neither of them makes sense. And then it had a long footnote explaining the prosecution history that you're pointing to and said, it's not clear to us that it requires a certain understanding. But again, one of the things that it pointed to was the fact that during the prosecution, the claim construction had put in process limitations about etch stop versus channel etching. And the PTAP said, well, there's no teaching about that. So the PTAP, the issue, the claim construction issue before the PTAP is whether or not this patent, these claims are limited to channel etch, TFT, as opposed to more, which was etch stop. And the PTAP just refused to weigh in. There wasn't a dispute like there was in this one. And in fact, if you look at page 1680, and that's operative semiconductor, wrong one. I'm sorry. So the point is that in is to be given as broad reading, as plain and ordinary meaning. There's nothing in the specification. It's their burden to point to something in the specification that dictates that the material must inhibit, inhabit the material of the semiconductor layer. There's no teaching of that in the specification. Specification uses the word in broadly. There's no citation upon which they rely. And in fact, the district court actually, in its opinion, if you read the next layer, the next sentence, which actually wasn't in the part of the opinion, it goes and it quotes that language that I've already given your honors about how it extends from the right edge of the one semiconductor layer to the left edge of the other. So the fact is that in should be given as broad and plain meaning. It's not like Chef America. There's no irreconcilable problem. The only thing that's irreconcilable is if we take the position of the appellees that in must be physically included within the material law. But there's no support for doing that, and they don't point to it. So. Let's hear from the other side. Thank you, Your Honor. Mr. Haslam, you've divided the issues with your colleague? Yes. I will be arguing the 190 and 589 issues. I will be arguing the Toshiba license issues on behalf of Toshiba so that we only have two lawyers instead of three lawyers jumping up and down. So I'll address the 589 and the 190 now, and I'll sit down and let counsel deal with the other two license issues, and I'll argue one of those. Okay, proceed. Starting with the 589, I think what the fundamental problem that the appellees have, the appellants have, is that when you look at the specification, the specification does refer to a silicon film. However, the specification is very clear when it talks about what the operative semiconductor is. It is that film after it has been patterned. And when it has been patterned, the specification talks about in column, I think it's column six, as well as, let me think it back. Yeah, it's column five. It says that after patterning, that forms a part of the... I'm sorry, what line? Huh? What line are you on in column five? I'm sorry, it's 55 through, I'm going to refer to it as 55 through 67. And it's talking about this process step after you've laid down the silicon film, and you now mask it, and then you etch. And what it says is the patterned photoresist film, and this is 58 to 60, 20B, serves as a mask for forming an operative device of the TFT. It then goes on in the next paragraph in talking about figure 7F. It talks about the amorphous silicon film, which is the film that was laid down across the entire device. And it says once that's patterned and washed, it then goes on to say in line 64, thus there is formed the patterned amorphous silicon film, constituting a major part of the TFT. The thus amorphous silicon film corresponds to the amorphous silicon pattern six, illustrated in four. And that is the patterned silicon film. It is not the entire film laid down. If you look at Claim 1, it distinguishes between films that are laid down completely, such as the substrate or the dielectric or the protection film at the end, from those structures which are formed, the gate electrode, the operative semiconductor, and the source and drain. Now, I want to just go back and remind the Court, Claim 1 was disclaimed. Claims 2, 3, 5, and 6 were held unpatentable by the PTAB, and this Court affirmed by virtue of a Rule 36 motion. So the only claim involved is Claim 4, which is dependent on Claim 1. And its only distinction is where, and the parties agreed to that, where is the location of the operative semiconductor. When you look at the claim, I believe that the specification reasonably clearly says that the operative semiconductor is the part of the semiconductor which, in fact, allows the transistor to operate. How many times in this specification does it actually use the term operative semiconductor? There's one at the top of Column 5. There's one at the top of Column 5. There's one at the top of Column 3. There's one at the bottom of Column 3 at Line 56. I believe that there's similar discussions when it talks about the second embodiment. But when it comes to usage of that coined term in reference to any of the figures, is the top of Column 5 all we have when it's discussing Figure 5? Well, I think you have a similar discussion when it talks about Figure 11 in the second embodiment. It's Column 7, Line 39 and 40 in Operative Semiconductor Film 6 formed on a silicon nitride film, which again is referring to the patterned island of silicon, not the entire film. But if we look at the claim, we get additional help on what the patentee and what the claim means about the operative semiconductor. Can I just ask, so when the top of Column 5 points to Operative Semiconductor Film 6 and you look back at Figure 5 for 6, it appears to be, what is that pointing to? If you look at Figure 5, it is, if you see Element 1, which is the gate electrode, if you see next to that is Element 6, which is pointing up to a U-shaped thing. And that is what it's referring to as the Operative Semiconductor. And as you can see… What the appellant would say to us is, if you look at the U-shaped item in comparison to the gate electrode 1, the U-shaped item looks bigger in terms of it covers more real estate compared to gate electrode 1. If you were to ascribe dimensional characteristics to these drawings, which I don't think necessarily this court has said you can't do that for non-scale drawings, which are not described as being dimensional, but it does overlie the gate electrode. Does the claim language require that it overlie or lay the gate electrode and not be anywhere else, or simply that it has to overlie the electrode, the gate electrode, even if it also extends beyond? The Operative Semiconductor has to be a part of the TFT, which is the function of Claim 1. It is to make thin film transistors in an array. It is not talking about making something that is not an Operative Semiconductor. I think I'm not hearing an answer to the question that was in my mind, whatever might have come out of my mouth. But I guess I… So, why does it matter even if this U-shaped thing extends both to the left and the right of the gate electrode? It does overlie it, but it may also extend beyond it. What does Claim 4 require? Claim 4 requires… Is it limited to the gate electrode? Claim 4 requires that the Operative Semiconductor, which the court said overlies the gate, but it also connects and contacts the source and drain. And that's clear from the claim, which says that the source and drain… …if the U-shaped thing extends beyond the gate electrode. Would it not be fair to say Claim 4 doesn't care whether it's formed only where the gate overlaps? It cares only about whether it is formed there. Whether it's formed elsewhere is of no consequence. That's their argument, but to say that it's… Is that their argument? I guess I truly may be deeply confused. I thought I was answering an argument that they were making. No, I believe what their argument, as I understand it is, and it's shifted over time, is that as long as you have an Operative Semiconductor in a TFT somewhere, if there is a silicon film at the overlap of the source and drain… …even if that location, it acts as an insulator and not as part of a operative device or as part of the TFT, that that falls within the scope of the claim. That's their argument. Because that's their infringement is, yes, we agree the TFT is not at the location of the overlap. You're also supposed to talk about 190, is that right? So do you agree that the claim construction adopted below requires either the impossible or the nonsensical? Yes. Yes, that is your position. Isn't that quite extraordinary? I mean, isn't that the kind of claim construction we would basically turn over every rock we could find to find a way of avoiding? Because why would a patentee write something that is as stupid as that? Well, it lines up with Chef America. If you look at the original claim and the specification, there was no dispute and there was no dispute at the PTAB that the channel, and there's a definition of channel, the claim construction of channel, that it is in the semiconductor layer that is not challenged on appeal. But to use the word in as part of the claim construction is truly unhelpful. What you mean is, is made of the material of? It is located in, physically located in. Now you're just back to a term that I don't yet understand. Does in for the semiconductor mean it is made of the material of? Yes, it is. That's the construction of channel that the district court came up with that's not on appeal. Channel, a portion of the semiconductor layer between the source and drain electrodes. That's what is the channel. And the specification says that that channel is in the semiconductor layer. It doesn't say that definition. It doesn't say it's in the element contact layer. And all the portions of the specification that appellant points to talks about the channel being in the semiconductor layer and between the edges of the source and drain, or extends from the source to the drain. And that's significant because in Chef America, the court is part of this decision where it said, yes, this is impossible. But that's nonetheless what we're left with. found that during prosecution, when they got the rejection, they had a choice. They could say heat to the temperature, or based on an example in the patent, they could have said heat at the temperature. And they specifically chose heat to. And the court said they had a choice. The specification, like the specification here, has a way to describe the channel with respect to the element contact layers. But in Chef America, just as here, they chose in without telling anyone during the prosecution that in now meant something different. It didn't mean the semiconductor layer or being physically in the semiconductor layer. Why would a skilled artisan have the thought that they were claiming something that everybody recognizes to be nonsensical? There wasn't anything nonsensical about Chef America. So that case is different on that ground. Well, it was nonsensical because you don't heat the dough to 400 degrees. You get a charcoal briquette. That was the whole purpose, I think, of the finding in Chef America, that this claim didn't make sense. It was nonsensical because what you wanted to do was to heat the oven to 400, whatever the temperature was, so that you could make whatever it was that they were baking into a particular thing. But the court said, we look at the language. The language says it's plain, ordinary meaning, I believe, of in, and supported by the definition of channel. It then went to the prosecution history and said, you had a choice. And there's language in the spec here, and there was language in the spec there. You could heat it to or heat it at. You intentionally chose the wrong one. And then they dealt with the expert testimony and said the expert came in and said, well, this is what it means. And they said, well, but the expert's not dealing with what the words in the claim actually say. And that's the same thing here. Yes, it's impossible. They even said it was impossible during claim construction. But that's what the specification says, and when they dealt with it in the prosecution history, they did not clearly say, we now mean in to mean something different. And until argument today, their argument was in, in the same place, in the same claim, meant two different things. One was physically in, and the other was bounded by. And I don't believe there's any case that this court has held where the same word in the same place, in the OMIC contact layer and in the semiconductor layer, that word in the same place in the same claim means two different things. Court, has any other questions? All right, let's hear from Mr. Roosevelt. May it please the court. I'm prepared to address today two issues on behalf of FUNAI. The first is FUNAI's defense based on the Panasonic LCD license agreement. The district court correctly found that modules purchased by FUNAI from Panasonic LCD were covered by a license and were therefore not infringing. The second issue is the Daubert question, the exclusion of damages testimony by Mr. Hampton, the economics expert for Mikes. The district court did not abuse its discretion in excluding that testimony. The court correctly found that Hampton failed to apportion damages to take into account the infringing features of the product as contrasted with the conventional non-infringing features. And the court also found that he derived his royalty rate from an unreliable starting point, namely a license offer made by Mikes on the eve of litigation that covered 364 patents and that FUNAI rejected and never accepted. So I realize we haven't touched on these yet and I'm happy to take either one or both. So sometimes in deciding whether a kind of evidence is insufficient, one asks what better evidence might there have been? So what is your view about what better evidence there might have been on apportionment? Well, I think that apportionment was done, for example, by both of the economics experts on our side. The patented issue in this particular question is the 927 patent, which covers the frame that holds the LCD module, which is essentially two pieces of plastic that sandwich the LCD panel in between them. And the supposed improvement of the patent is that there are protrusions and depressions in the plastic that essentially allow the two pieces of the frame to snap together rather than being fastened together with screws or adhesives or other fasteners. And so there is an obligation under this court's cases to distinguish between the inventive features of the frame and the conventional features of the frame. They didn't come up with the idea of the plastic frame itself. So we have both of our damages experts did things like looking at the cost savings associated with screws that don't have to be used or glues or labor time that's easier to snap together. There are different ways one can look at that. They also looked at the profitability of this particular component as a part of the overall price of the television. And at least one of them considered other licenses of sort of similar technology. So I think there are a number of different starting points one can take. What do you mean by looked at the profitability of this component as part of the television? Well, I think that there were, well, I think that there were analyses done. If you consider, for example, Toshiba's expert, Mr. Lewis, as his starting point, he took, you know, you could start, you could come up with your starting point by looking at the cost of a design around, which was the screw savings. You could come up with market comparables, which were essentially other licenses that exist in the universe for this type of technology. And he talked about the income, essentially the percentage of the profits of the television that can be somehow apportioned to the frame. Right. I guess that's the point that I guess I'm trying to translate into something that I understand. That sounds like a conclusion, not like a here's how you would figure that out. Well, I don't have in front of me, and I don't think in the joint appendix, were the portions of the report where he went through the three different starting points. But I can represent to you that he presented an analysis for the starting points based on the cost, the market and the so-called income. If you were doing a hypothetical negotiation, is there really something wrong with having a starting point? Namely, what does the patent owner ask for? And then you say, whoa, that's ridiculous. And it's ridiculous because when you do the economic analysis, that's not at all what the value of the technology is. But is there really something wrong standing alone with starting with the ask of the patent owner? Well, I think under this court's cases, there is a there is a big problem with that. First of all, as the court as the court said in Laser Dynamics, even if you had an accepted settlement agreement that arises in the context of litigation, it's questionable whether that represents what would what would actually happen in a hypothetical. But this is we're only talking about a starting point. The analysis presumably has many miles to go. Well, but if you start with you have a garbage in garbage out problem, right? If you start with an unreliable starting point. No, it depends what you do, but do it step two and step three for 67. Well, what negotiation starts with, I'm the patent owner. I come in and I say, pay me a million dollars. And the other side says, you are not paying you a dime. Now, let's try to talk. I mean, isn't that the model of the of the negotiation? And and then you start getting to the discussion about what the alternatives are for the, you know, the would be defendant or would be would be infringer. Here's what you earn if you don't have the technology. Here's what you can earn if you do have the technology. Let's figure out the net and let's figure out how to how we might divide that up. But what is the starting point of matter all by itself? Well, let's be clear, though, about what happened, right? So what what Mr. Hampton did was he took as his starting point, this extremely inflated licensing offer, which, again, covered an immense portfolio of patents. He then arbitrarily said there were only 10 patents asserted. Therefore, I assume that each patent gets one tenth of the value of this of this license. I ignore the 354 patents that were not asserted in this particular litigation and assign them zero value. And then he takes this one tenth of this of this portfolio number and says that, therefore, the value of this 927 patent, this frame improvement is this amount. The danger with that way of proceeding is twofold. And I think this was this was addressed by the court quite directly in the Witserv case. You'll find that at 694 F3rd 29 to 30 proposed but unaccepted license is a fiction that contradicts the expert's prior testimony. And that's exactly the same situation we have here, because originally Mr. Hampton had done a sort of a cost based savings based starting point. When he was told that he couldn't stack up the royalties from all of the patents on all the products, regardless of whether they had been accused of infringing the different patents, he had to sort of disaggregate his aggregated royalty rate. He completely abandoned the starting point that he had before. He grabs on to this license, which was never accepted. And all of a sudden he has a starting point that's nearly twice as high as he had before. So we have, just as in Witserv, the only starting point that we have here is an unaccepted offer that contradicts his prior testimony. What is the status in this proceeding at this point of the disaggregated alternative way of doing it? So in this point, Mr. Hampton had abandoned that in our case. He had also abandoned the starting point that he had used before. That's correct. He rejected the starting point that he used in his first report, in his supplemental report, because by the time we got to the supplemental report right before trial, there was essentially only one patent left in the case, which was the 927. He jettisoned his entire analysis of the starting point, plucked this license offer out of thin air, said, I have the number that he says is confidential in the record, but it's a certain number of cents. I look at the Georgia Pacific factor. Some go up, some go down. And hey, presto, here's a number that's 10 cents lower than what I started with without any explanation of how he got there. All of those numbers being quite a bit higher than any number he started with in his first report. And he never explains why he changed from one starting point to the next starting point. So the parallels to Witserv are quite strong in that we have an unaccepted offer that's used as a starting point that can't really be squared with the rest of the analysis. That X mark also applies here. X mark also applies in the same way. I think X mark in particular is relevant for the apportionment issue that one has to distinguish between the patented and the conventional non-patented elements of the device. And also that a superficial recitation of the Georgia Pacific factors followed by conclusory remarks is not enough to support a verdict on damages. And I think, again, while mathematical precision is not required, the court said some explanation both of why and generally to what extent the particular factor impacts the royalty calculation is needed. And that's completely absent from his report. So the court was well within its discretion in deeming the damages opinion to be unreliable. Any more questions for Mr. Rosen? Thank you. Judge, you have four minutes. Are you ready for rebuttal? Yes, I am. I'll briefly touch on Mr. Hampton. There was another codefendant that had been sued originally who actually accepted terms and conditions close to the ones that were offered to Punei. And he considered a number of different things in coming to the determination as to what should be his starting point. And the fact that there are other alternative apportionments doesn't make his wrong. In fact, there really wasn't. But I do want to talk about the two patents. On the 190, and I think, Your Honor, you hit on it perfectly. Why would a skilled draftsman draft a claim that's completely insane? They wouldn't. And the only reason why this claim is ready. Do you have a way of saying why Chef America doesn't say so be it? Yes, I do, Your Honor. Because in Chef America, heat the dough to 850 to 400 to 850, that was unambiguous. Here, the word in is entitled to the full range. It's ordinary in plain meaning. And it can mean positional. It can mean location. It can mean within the limits of. The only reason why there's this quote irreconcilable problem is because the defendants who bear the burden of establishing that the specification dictates that in has to mean in the same material included within the material. They put that limitation in. And that limitation and only that limitation for which there's no support in the spec. I guess the concern I have is that you're asking us to read the word in in two different ways. When it says in Layer 1 and Layer 2, you want us to say, well, for Layer 1, in means one thing. And then for Layer 2, it means another thing. No, I want you to. That's a little difficult to accept. No, I'm not, Your Honor. I'm asking you to be read in accordance to its full scope of its plain and ordinary meaning. And that means positional. The fact that the position happens to be within the upper and lower limits of the semiconductor, the fact that that position happens to be within the material of the semiconductor is a reasonable definition of in. The fact that it's defined by the limits of the inside of the ohmic contact layer as expressly recited at Column 2 in the patent. And again, under CONICA, the fact that Column 2 doesn't use the exact words that are in the claim is not fatal. That's the broad range of in. This isn't like the word conductor where it could mean a person with a baton. It could mean someone who takes tickets. It could mean a wire that conducts electricity. This is the word in. And it's always read in the context in which it's used. And all we're asking the court to do is read the claim in the context of which the way the word in was used and in accordance with the specification. Because here's the problem, Judge. If we go to 580, and Your Honor was asking, it talks about operative semiconductor at the top of Column 5, operative semiconductor film 6, which is that red box. Now, Judge, you have to understand. At summary judgment, we showed that the accused devices have operative semiconductor that extended beyond the yellow line all the way to the edge of the picture where the overlap of the bus lines is. That's what the accused device has. They have operative semiconductor that's a formation of operative semiconductor that extends to that edge. And to get summary judgment, they said to Judge Andrews, no, no, no, no, no. Just what's inside the yellow box? And now they come in here, this court, and they say, well, no, operative semiconductor could be the red box. And, Judge, you don't even have to rely on the figures. You can look at the specification at Column 5 where it describes box 6 as operative semiconductor at Column 5, lines 8. And it describes it actually as morphosilicon at Column 5, line 67. And most importantly, if the court looks at 55 to 60, it says the patterned photoresist film, 20B, shows as a mask for forming an operative device of a TFT. An operative device is something different. In order to read operative semiconductor as only limited with a TFT, the court then has to rewrite Claim 4. Because the only way to make Claim 4 make sense is that Claim 4 is some coded message that you then move the TFT. There's absolutely no teaching in moving the TFT. So to rule that operative semiconductor is a function that is limited to inside the TFT would violate every single canon of claim construction that's been handed down by this court for the last 35 years. Because it would remove all the disclosed embodiments. It would remove the preferred embodiment. It's inconsistent with the use of the word in the claims. There's nothing that would allow this court or Judge Andrews to rewrite Claim 4, which is what you have to do. Particularly where the claim says form operative semiconductor at the overlap. Judge, back to your question about Chef America. In Ortho McNeil, this court said, this court and the district court must interpret the term to give it proper meaning to the claim in light of the language and the intrinsic record. This case, like Chef, is distinguishable because Claim 1, or back to the 190, canon should be interpreted as the patentee intended with the meaning and connoting all alternatives. So as long as this court construes Claim 1, or construes in the 190, in its full range of ordinary meaning, then Chef America is distinguishable. Judge, the specific comments you think Judge Shannon asked me about, about distinguishing Mora, that's actually in the appendix in 9183. They were not to distinguish the admitted prior art. With respect to the PTAB issue on the 190 about claim construction. The PTAB objected to our use of channel etching in the claim, and that figures at the APP at 1181 and 1184. I made my point about that point fine. I think we need to move on. Any more questions? Any more questions for counsel? Okay. Thank you. Thank you all. The case is taken into submission.